UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ROBERT RYAN RAUCH,

    Petitioner,

    v.

ALICE PAYNE,

    Respondent.

Case No. C05-5243RJB

REPORT AND RECOMMENDATION

**NOTED FOR:
SEPTEMBER 9th, 2005**

INTRODUCTION AND SUMMARY CONCLUSION

This 28 U.S.C. § 2254 petition for habeas corpus relief has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 (b) and local Rules MJR 3 and 4. Respondent has filed an answer showing the petition to be a mixed petition with exhausted and unexhausted issues. There is nothing that indicates petitioner could not file a personal restraint petition in state court to exhaust the unexhausted issue and petitioner has not responded to the answer. Accordingly this petition should be **DISMISSED WITHOUT PREJUDICE** as a mixed petition.

FACTS

Respondent sets forth the facts of petitioner's crime as follows:

    A.    <u>Suppression Hearing</u>.

REPORT AND RECOMMENDATION - 1

Johnson[sic] was charged with manufacturing methamphetamine. He moved to suppress the evidence found in his hotel room. The trial court held a suppression hearing, at which Detectives Johnson and Hamlin testified.

On September 10, 2002, according to Johnson, he and Hamlin were told that Rauch was at a local hotel room and would "be involved in some type of a drug transaction that was going to occur ... somewhere in the Vancouver area[.]" En route to the hotel, Hamlin was told that a methamphetamine lab and a child might be inside the hotel room. When they arrived, the two officers saw Annette Casseri leaving Rauch's room. She said that her child was inside the room, that a "chemical odor [was] coming from the bathroom[,]" and that she believed Rauch was cooking methamphetamine. She was concerned about her child's safety.

Johnson and Hamlin "decided to go up and knock on the door and make contact with Mr. Rauch or whoever was in the room to investigate the possibility of a methamphetamine lab[.]" Given the risk of fire, explosion, and exposure to toxic fumes and chemicals, they were "obviously concerned for the health and safety" of the child and others in the hotel.

Johnson knocked on the door several times. No one answered, but he could hear a child crying inside. Before knocking the fourth time, he announced that he was "'hotel security'" and said, "'Sir, you need to come and answer the door." He identified himself as hotel security because he was concerned that the situation could escalate to a hostage situation or that Rauch might try to destroy evidence.

Rauch opened the door, and Johnson saw a crying child sitting on the floor inside. He also smelled, for the first time, a chemical odor that appeared to come from the nearby bathroom. Johnson testified that he had smelled this same odor at other sites where there were methamphetamine labs and that he associated this odor with the chemicals usually found at such sites. Johnson asked Rauch "about the activity in the bathroom and the smell[,]" and Rauch tried to close the door. The two officers grabbed him, identified themselves as police, and demanded that he cooperate. The three then struggled until they all fell to the hallway floor, where Johnson handcuffed Rauch.

During the struggle, the hotel room's door had closed and locked. After securing Rauch, Hamlin obtained a key from the front desk, opened the door, and removed the child from the room. They returned the child to Casseri and left the door open to ventilate the room.

After another officer arrived, Johnson entered the room. He confirmed that the odor was coming from the bathroom, and he went into the bathroom to determine what type of reaction was occurring and to assess potential hazards. He found the bathroom fan running and, under an overturned wastebasket, two Mason jars containing a liquid. He opened a window and the odor dissipated quickly.

After Johnson had completed his initial sweep of the room, the officers returned Rauch to the room and sat him on the bed. Concerned that Rauch might have hidden lab components before answering the door, Johnson wanted to search the room more thoroughly. He asked Rauch to consent to a search, but Rauch refused to consent. He asked again for consent, which this time Rauch gave. At this time, Rauch was handcuffed, sitting on the bed, and more relaxed and cooperative than before. Johnson had not given the Miranda rights or asked Rauch to sign a consent form, but

REPORT AND RECOMMENDATION - 2

he had said that Rauch could refuse to give consent and that he could limit the scope of the search or withdraw his consent at any time. Rauch did not ask for a lawyer, withdraw his consent, or attempt to limit the scope of the search. After obtaining Rauch's consent, Johnson searched a dresser, some cabinets, a small refrigerator, and a large duffel bag that Rauch said was not his.

Rauch testified differently. He said that when the officers knocked on his door he thought it was Casseri's husband or one of her husband's friends; Casseri's husband had recently been released from prison and wanted to talk to Rauch about his relationship with Casseri. Even after he opened the door, he still suspected it was Casseri's husband or one of his friends. When someone tried to grab him, he attempted to jump back and yell, "'It's not me, it's him,'" to give himself an opportunity to escape. He was knocked unconscious when they landed on the hallway floor, and when he came too, he was being handcuffed. Johnson threatened to "put his foot through [the] back of [his] f-u-c-k-i-n-g head" if he did not cooperate, and he hurt his leg during the struggle. After being returned to the room, he told the officers that they could search his bags and his person, but he refused permission to search the entire room.

The trial court found that the officers' testimony about Rauch's consent was more credible than Rauch's. It concluded that Johnson's initial entry and cursory search were justified under "the community caretaking doctrine and the emergency/exigent circumstances exception to the warrant requirement"; that after this cursory search was complete, the emergency/exigency was extinguished; and that Rauch had voluntarily consented to the later search. Thus, it denied the motion to suppress.

B.   <u>Trial</u>.

At trial, Johnson testified as he had at the suppression hearing. He also detailed the anhydrous ammonia method of manufacturing methamphetamine and described items associated with it, including (1) Sudafed or cold tablets containing pseudoephedrine or ephedrine; (2) anhydrous ammonia; (3) lithium, generally obtained from lithium batteries; (4) water or alcohol; (5) coffee filters; and (6) hydrogen chloride gas, often generated by combining rock salt and battery acid or muriatic acid. He said that the first phase of the process involves grinding or crushing pills containing pseudoephedrine or ephedrine, dissolving them in water or alcohol, and then filtering out the starches and binders using coffee filters. The dissolved pseudoephedrine or ephedrine remains in the filtered liquid and the solution is dried, leaving powdered pseudoephedrine or ephedrine. Lithium is then added and anhydrous ammonia is squirted over the top. The result is methamphetamine in a "sort of a paste" form that is not easily consumed. The paste is treated, often with organic solvents and hydrogen chloride gas, to create the more easily ingested methamphetamine salt.

Johnson also described items found inside the room, including (1) two clear Mason jars, one containing a clear liquid; (2) a container similar to those he had seen used to generate chlorine gas; (3) lithium batteries; (4) a jar containing used coffee filters and a dark pasty compound; (5) packages of "pseudo-ephedrine tablets, cold tablets"; (6) unused coffee filters; (7) a gallon jug of muriatic acid; (8) a digital scale; (9) various packaging materials; (10) an unidentified white powder later identified as a cutting agent; (11) a police scanner or radio; (12) paperwork and personal correspondence containing Rauch's name; (13) papers containing "miscellaneous drug

REPORT AND RECOMMENDATION - 3

notations"; and (14) a glass pipe commonly used to smoke controlled substances. Johnson responded affirmatively when the prosecutor asked, "Based on your observations at the defendant's hotel room and based on your training and experience and your investigation of the items, collection of the evidence found in the room, was there in your professional opinion evidence of a methamphetamine lab present?"

A forensic scientist from the Washington State Patrol Crime Lab testified that (1) the clear liquid contained "methamphetamine, a chemical byproduct that we refer to as the 150 compound, and ... ephedrine and/or pseudo-ephedrine"; and (2) the dark pasty compound contained methamphetamine and ammonia. She also testified that methamphetamine has several chemical forms. One form, known as "methamphetamine base," is a liquid or oily substance consisting of large groups of methamphetamine molecules. Another, more common form is methamphetamine hydrochloride salt, a white crystalline solid. She further testified that "[t]here are also other salts of methamphetamine."

The jury found Rauch guilty of unlawful manufacture of a controlled substance (methamphetamine), a violation of RCW 69.50.401(a)(1)(ii). The trial court used a seriousness level of X to calculate Rauch's standard range, after which it imposed a standard range sentence.

(Dkt. # 11, pages 2 to 4).

C.  Procedural History.

Petitioner filed a direct appeal in which his counsel raised the following issues:

1. Does a trial court err when it enters findings of fact unsupported by the record?

2. Does a trial court err when it refuses to suppress evidence the police seize in violation of a defendant's right to privacy under Washington Constitution, Article 1 § 7, and United States Constitution, Fourth Amendment?

3. Does a trial counsel's failure to object to opinion testimony that a defendant is guilty deny a defendant the right to effective assistance of counsel under Washington Constitution, Article 1, § 22, and United States Constitution, Sixth Amendment?

4. Does a trial court err if it uses an incorrect sentencing range and thereby imposes a sentence in excess of the standard range and in excess of the statutory maximum?

(Dkt. # 12, Exhibit 2, page 2).

Petitioner filed a statement of additional grounds and raised two issues:

1. Counsels failure to subpoena Annette Casseri.

2. Failure to give Miranda rights prior to searching the hotel room.

(Dkt. # 12, Exhibit 3, pages 2 and 3). Petitioner also filed a supplemental brief which raised Fifth

REPORT AND RECOMMENDATION - 4

Amendment arguments concerning the prosecutors alleged remarks as to plaintiff's exercising his right to remain silent and his being in custody when the officers knocked on his hotel door. (Dkt. # 12. Exhibit 4).

On Jun 21st 2004 The Washington State Court of Appeals upheld the conviction and sentence. (Dkt. # 12, Exhibit 5). Petitioner filed for discretionary review and raised the following issues:

1. The trial court erred in entering unsupported findings of fact.

2. The trial court erred in denying the motion to suppress.

3. The prosecutors allegedly improper references to petitioner's exercise of his constitutional rights affected the defendants right to a fair trial.

4. Trial counsel was ineffective for not objecting to inadmissible evidence.

5. When police officers refused to accept petitioners decision not to answer the door the defendant was in custody.

(Dkt. # 12, Exhibit 6). Review was denied without comment on February 1st, 2005. (Dkt. # 12, Exhibit 7).

This petition followed and petitioner raises the following arguments:

Ground one: Right to privacy under Wash. Const. art. 1 § 7; U.S. Const. Amend. 14.

FACTS: The emergency exception to the warrant requirement did not justify officers actions of dragging Rauch out of his room and searching the room. The officers testimony concerning the search under emergency reasons was because he smelled a slight chemical odor that he could not positively identify. There was no confirmation of any crime prior to the search, that granted any subsequent legal search of the premises.

Ground two: Violation of Fifth Amend. right to remain silent without inference of guilt.

FACTS: Rauch was not mirandized, the officer's report and testimony clearly confirms this fact. Rauch was not informed that he had the right to remain silent or have a lawyer present. Rauch did not knowingly and voluntarily consent to a search of the room. Rauch was threatened with more physical harm if consent and cooperation was not given. The search took place only after the officer's used physical force on Rauch.

Ground three: Counsel rendered ineffective assistance in violation of U.S. Const. Sixth Amendment.

REPORT AND RECOMMENDATION - 5

> FACTS: Counsel's failure to call Annette Casseri for cross examination concerning information obtained resulting in illegal search and seizure. Failure to object to testimony given by officers disputing information obtained by witness who did not testify under oath.
>
> Ground four: Violation of Sixth Amendment right to confront witnesses against Rauch. i.e. Annette Casseri. Supporting FACTS: Rauch asked his attorney to subpoena Annette Casseri, the accuser. Defense counsel refused to call the witness against Rauch.

(Dkt. # 4, pages 5 and 6).

## DISCUSSION

### Exhaustion of State Remedies.

In order to satisfy the exhaustion requirement, petitioner's issues must have been fairly presented to the state's highest court. Picard v. Connor, 404 U.S. 270, 276 (1971); Middleton v. Cupp, 768 F.2d 1083, 1086 (9th Cir. 1985). A federal habeas petitioner must provide the state courts with a fair opportunity to correct alleged violations of prisoners' federal rights. Duncan v. Henry, 513 U.S.364, 115 S.Ct. 887, 888 (1995). It is not enough that all the facts necessary to support the federal issue were before the state courts or that a somewhat similar state law claim was made. Id, *citing* Picard v. Connor, 404 U.S. 270 (1971) and Anderson v. Harless, 459 U.S. 4 (1982). A federal court faced with an unexhausted petition dismisses the petition, without prejudice, so that the petitioner has an opportunity to exhaust the issues in state court. Rose v, Lundy, 455 U.S. 509, 522 (1982).

Here, petitioner did not present any issue regarding the failure to call Annette Casseri as a witness when he filed his petition for review with the State Supreme Court. (Dkt. # 12, Exhibit 6). This issue is therefore unexhausted and this is a mixed petition. As the decision to deny review of the direct appeal was not entered until February 1st, 2005 petition presumably has one year from that date to file a collateral challenge to his conviction and sentence. Accordingly, this petition should be **DISMISSED** as a mixed petition.

## CONCLUSION

Based on the foregoing discussion, the Court should **DISMISS** the petition **WITHOUT PREJUDICE.** A proposed order accompanies this report and recommendation.

REPORT AND RECOMMENDATION - 6

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **September 9th 2005**, as noted in the caption.

DATED this 18th day of August, 2005.

> */S/ J. Kelley Arnold*
> J. Kelley Arnold
> United States Magistrate Judge

REPORT AND RECOMMENDATION - 7